Good morning. May it please the Court, my name is Carolyn Anderson, and I represent the appellant in this matter, Randy Hutton. I've got a bit of a cold, so please forgive. Mr. Hutton was a 32-year employee of Jackson County, and he was terminated after 32 years. He filed suit in Oregon State Court, and his counsel below eventually amended to add Federal claims to his complaint. The case was removed to Federal court. The defendant, Jackson County, eventually filed motion for summary judgment, and that motion was granted in full. We are here on appeal only on Mr. Hutton's first claim for breach of contract. We have not appealed any of the other State claims or any of the Federal claims. We're just here to discuss the breach of contract issue. And if I can frame the issue on appeal, first and foremost, the question is whether summary judgment was appropriate. Was it appropriate for the district court to enter summary judgment on that contract claim? And to answer that question, I think we really have two areas of inquiry. First of all, was there a contract? And second of all, who gets to decide? Who gets to decide if that contract was, in fact, breached? Does the district court sitting in summary judgment get to decide that, or does the jury get to decide that? Let's assume, for purposes of argument, that you can at least survive summary judgment on the question as to whether there was a contract. Which we did, in fact. So let's assume that. The question, then, is, is it appropriate to get summary judgment on the question of material breach by your client? I agree completely. And the district court below, in its order granting summary judgment, conceded that very issue, that, yeah, let's assume that there is a contract here, because there were disputes of fact as to whether or not Mr. Hutton had been given a just cause agreement for his, for his employment. So let's move on and look at. Let me state the evidence that I think is undisputed as against your client, and then you can tell me if I'm mistaken as to whether or not things are in dispute. Fair enough. He had had some difficulties with the people running this CB Park. So there was some tension. That's correct. He had been told by the new person coming in, is it Mr. Vial, is that how you pronounce it? It's an odd name for a supervisor. Or not. In Dickens, it would be perfectly appropriate. That he needs to, quote, set an example. Yes. He has a prior history of wanting to use the company vehicle, go back and forth, and he's been protesting. He's got a prior history, at least once, of talking on his cell phone, running red light, and getting a ticket for so doing. Apparently there's policy in, while driving a county vehicle, you're not supposed to be talking on a telephone. The two precipitating episodes for the firing are, number one, there's a downed tree in the CB Park. He goes with his chainsaw, cuts it up, and takes some of the wood for firewood. That's correct. The other episode is, while driving the county vehicle, he goes to a medical appointment at the hospital, which may or may not have been on the ordinary sort of way to something else he was doing. That's correct. Is that an accurate summary of what's in front of us if it's undisputed? It's an accurate summary of the employer's view of the facts in this case. And the reason I say it that way is because, as you might imagine, with any allegation that leads to termination of a 32-year employee, there are going to be disputes, just by way of example. So if you would push back and say whatever qualifiers you want to make based on your view of the evidence and the record. Let's talk about the county policy with regard to the vehicles, the vehicle use. My client went to a doctor's appointment, which was on the route that he was traveling for work purposes that day. He was up in White City, which is in the north of the county. He had to go to Emmergant Lake, which is in the south of the county. And he drove right past Providence Hospital in Medford, where he had a doctor's appointment. He didn't deviate. Or let me put it this way. The question is, did he deviate substantially from his work route? Why does that have to be the question? Why couldn't the question be why couldn't the policy be we don't want county vehicles showing up in private places where it suggests that we're not on business. And the parks and rec folk are, if they're at the hospital, this is not good advertising for parks and rec. We don't want parks and rec vehicle associated with hospitals. And the county could certainly have that policy. But, again, the facts that were shown in the summary judgment below is that Mr. Hutton's own supervisor had deviated from a work route one day because he wanted to go home to use a restroom. Mr. Hutton was present. He was driving when that occurred. And so as far as Mr. Hutton could see, the county may in fact have had a policy. They may have had a zero-tolerance policy. I don't think they did. But he had warning in writing about this before. I beg your pardon? But he had warning in writing about these kinds of incidents before. He had had an oral. It's not only clear that the county might have had a policy, the county clearly did have a policy because he had letters in his personnel file. Respectfully, he had an oral reprimand. He had an oral reprimand which, pursuant to county policy, was reduced to writing. But he had an oral reprimand initially with regard to using a county vehicle. He stopped at home for lunch. And he received that oral reprimand back in November of 2007. And mind you, the county had always had a policy that it was okay for folks to use the county vehicles and to in fact take them home at night. That policy changed. That policy changed. And after the policy changed, he took the vehicle home for lunch and he was given an oral reprimand for violation of the policy. It was not a written reprimand at that point. In which he would have had to have driven his private vehicle over to the county, then he would have picked up the truck and driven around on county business and then dropped the truck back off at the office at night, taken his home, his personal vehicle and gone home. Correct. I believe that was the ---- But what he should have done in the incident at lunch was he should have left his truck at the parks and rec, taken his own vehicle, gone home. Sure. Sure. He could have done that if there were a zero tolerance policy and if that were in the policy, he could have done it that way. But what he, when he didn't do it that way, he received an oral reprimand, not a written reprimand, and that was after years, 25, 26 years of being allowed to use a vehicle on that. But there clearly had been a change in the policy. Correct. That wasn't a secret. It wasn't like they sprung something on him. I absolutely, yes, sir. I absolutely concede that. The question is, the question is, do you take a 32-year employee and fire him after an oral reprimand for that conduct and after a written reprimand for the red light citation? He was captured by a Medford police officer turning right on a red without a full stop. And he was cited and the employer issued a written reprimand as a result of that citation. That had nothing to do with the use of the county vehicle at the time. Well, can I ask a more foundational question to put all of this weighing of the evidence or dispute in context? What does the employer have to show to justify its actions? This is not a Title VII case where we have this McDonnell-Douglas kind of type of situation. Well, and that's... You'll find out I tend to ramble a little bit on my questions. So let me get to the question. But I want you to know where I'm coming from, okay? So trying to transfer this into the Oregon public employee employment context, what does the employer as a public employer have to show to justify? I understand the district court applied the Simpson test, which you take issue with because it's a private employment. But nonetheless, if one assumes it's a property interest, there is a property interest, maybe. What would be the standard? And therefore, this dialogue we're having about the sufficiency of the incidents, what is it that the employer has to show? Well, and I think you go right to the heart of it. What do they have to show? And I think the Simpson test is inappropriate because Simpson only requires substantial evidence. Remember, in Simpson, there was a bench trial in that case. So what's the standard for, in your view? Can you just give me a... Oh, I think... What would you state the standard to be? I think that in any labor arbitration, for example, you have to have preponderance of the evidence. It's not merely a substantial evidence showing. If Mr. Hutton is entitled to just cause for termination, he's entitled to an adjudication of the facts, and he never received that. He was... So it's always a factual dispute? It is in this case. I don't want to make a broad policy statement. In this case, there are factual disputes regarding the reason for the termination and whether the policies were actually violated. That's why I'm having a little trouble with the argument. I don't know if you're trying to make what in the Title VII case would be a pretext argument, or are you just saying that all these incidents don't add up to a violation of county policy adequate to deprive him of his job? I am, Your Honor. And there were other claims below with regard to retaliation, whistleblowing and so forth. We're not here on appeal on those claims, but they would certainly come out at trial on the breach of contract issue as to the employee's true motivation in the termination. Let me ask it this way. We're taking you over time, but we get to do that. You don't necessarily get to do it to us. If it is undisputed, and I don't ask you to concede that it's undisputed, if it's undisputed that there is a clear policy against taking wood out of the park, if it's undisputed that there's a clear policy that you don't stop at a public place on an errand, such as a doctor's appointment, leaving the vehicle in the parking lot, and if it's undisputed that we've had prior incidents in which there's some clear tension between Mr. Hutton and his employer, is that a breach sufficient to justify firing? Is that a good cause? Assuming all of those things, I would say no in this case, because Mr. Hutton was a manager himself for 32 years. He knew he had to dot his I's and cross his T's whenever he disciplined anyone. There were hoops to jump through, and progressive disciplinary action was required. I think one of the factual issues here is did he receive adequate progressive disciplinary action? Is an oral reprimand followed by a written reprimand sufficient to terminate a 32-year employee? I don't think it is. I don't think they never suspended him. They didn't demote him. They didn't have a last chance agreement with this fellow. I don't think it was sufficient, given the facts of this case, for a 32-year veteran in the county employment. Okay. Let's hear from the other side, and then we'll give you a chance to respond. Thank you. May it please the Court. Dave Rewald appearing on behalf of Defendant Apelli Jackson County. I have very little to add to my brief. If I could just briefly summarize the two issues that I believe are before the Court. The first issue is whether or not Mr. Hutton was an at-will employee or whether or not he had a contract requiring the county to have cause to fire him. It's clear that under Oregon law, whether or not a contract exists is a question of law. The district court even acknowledged that in the district court's opinion. And it's also clear under Oregon law that Oregon statutes provide that county employees in the state of Oregon are employed at will, and that the only entity that has the power to create an exception to the at-will rule is the three-person county board of commissioners. It's also undisputed in this case that the county board here never made an exception for Mr. Hutton. It's my understanding that Oregon law would permit, and the district court I think assumed as much, that conduct of the management of the responsible people who appointed and supervised Mr. Hutton could create a for-cause relationship. And indeed, two of those gentlemen testified that that's what they believed the standard was. They did testify that that's what they believed, but under Oregon law, they did not have the power or the authority to create an exception. So it makes no difference? There's no such thing as creating a for-cause relationship by conduct? Not in the context of county employment, Your Honor, because Oregon law ---- The case authority for that would be what? I believe that's the ---- well, Brunick v. Clatsop County says that pursuant to the Oregon statute, ORS 204-601, all county employees are employed at will. Exceptions can be made, but under Oregon law, the only entity that can make an exception is the three-person county board of commissioners. Not even a single county commissioner would have the power, the authority under Oregon law to make an exception. It would have to be the board as a whole. You know, if the Oregon law on the point is as clear as you say, I'm a little surprised that an experienced judge sitting here in Oregon bypassed the question and went to the other question. Judge Clark did do that, Your Honor, and moved on to the second question, as I will if the Court would like me to move on to that one. The second question, then, is whether or not assuming there was some contractual requirement that the county have cause to fire, was there cause? And in response to the Court's earlier question, this is not de novo review by the district court or by this Court on whether or not cause exists. It is the substantial evidence standard that was created in the Simpson case. Mr. Hutton may not like the Simpson case, but it is Oregon law and has been for quite some time. And so the test that the district court applied correctly was whether or not there is substantial evidence in the record showing that there was cause. And the plaintiff even concedes that there is substantial evidence in the record. And so in light of that, we would ask the Court to affirm the district court below. You know, as I read this record, it's pretty clear that Mr. Hutton was getting crossways with Mr. Vile, getting crossways with the people who were administering the CB Park. And at least a possible inference from the facts we have in front of us is that his employer was looking for a way to can him. And then when he takes some wood from the park and when he stops for a doctor's appointment in the middle of the day, kind of en route between one job and another, they say, gotcha. That's what the case looks like to me. I don't think that is a proper inference from the evidence, Judge. He was a 32-year employee. We, the county values him. But he sounds like he's a pain in the neck, because when they say, listen, you can't take the vehicle home anymore, he objects. I mean, he's not the easiest employee in the world. That may be true, Your Honor, but I don't believe it leads to an inference that they were out to get him. And even if they were, there's still substantial evidence in the record to show that there was cause, given the history. He had an oral warning in 2006 for inappropriate vehicle use. He had an oral reprimand. Which one is that? That is he had an oral warning, inappropriate driving his county vehicle home for lunch. That was in 2006. In 2007, he did it again and got reprimanded. Did it again, drove home for lunch again? Twice, Your Honor. And then in the spring of 2008, Mr. Vile, with the interesting name, shows up, and he lays out his expectations for all his managers. And a key expectation is that you set the example for your subordinates. And this is the same Mr. Vile who stops off to go to the bathroom using a county vehicle, setting an example? Who had the emergency medical condition, Your Honor. He had a medical condition that would cause him to have diarrhea on the spur of the moment, and they just happened to be driving past his house. And so, yes, he had an emergency medical condition. I don't think even Mr. Hutton would expect him to have continued to drive on to their next appointment in that kind of a situation, Your Honor. So Mr. Vile laid out his expectations, set the example for your subordinates, and clearly he did not do that. And so he also got ethics training in 2008 on the vehicle policy. There were numerous meetings Mr. Vile had with his managers talking about the proper use of county vehicles. And then he got another written reprimand for riding through the light talking on his cell phone. So it's not just the vehicle use that led to his termination. I think it's important for the Court to remember the substantial evidence consists of the firewood theft, the irreparable damage that that did to the relationship. How clear is it in the record that his taking of this firewood is properly characterized as theft? There's declarations from the human resource person, Mr. Serra. There's a declaration from Mr. Vile. Both of them viewed it as theft. The county, there's also in the record undisputed evidence that the county consistently terminates employees who are believed to have engaged in theft. Yes, but so far you're giving the evidence from your side that it's theft. Do we have undisputed evidence that it's properly characterized as theft? Well, whether it's theft or not, whether we use the label theft on it, even the plaintiff, and I think this may be the most significant piece of evidence in the entire record, at his deposition Mr. Hutton even admitted to me that he believed he deserved discipline for what he did. It's undisputed that he even thinks he deserved to be disciplined. The only dispute he has is he thinks the discipline of firing was too severe. What's your response? Is that your response, implicit response to the progressive discipline argument? All these other incidents were progressive. Was he ever given any warning that if his behavior continued that he would be terminated? In each of the warnings that he received that were reduced to writing, yes, he received the standard phrase that they put at the end of all discipline is any further discipline could lead to further discipline up to and including termination. And so he clearly was on notice that that was the, that that could happen. I think the progressive discipline issue that counsel raised is a red herring myself. That's never been raised below as that the discipline somehow exceeded the next step that was supposed to occur along the way. So that's all I have for the court. I'd be glad to answer any other questions. I want to pursue a little bit more of the firewood issue. There's evidence in the record, and I'm trying to figure out how much of it is disputed and undisputed, that suggests that downed trees in this park, and it's a fairly large park, would be cut up and that the firewood would be available for users of the park. Is that what would happen? Yeah. Would it be sold? There was some evidence that suggested it was sold to users of the park, but I couldn't tell whether that was really true or just a suggestion. That is true, Your Honor, that the Greater Applegate Community Development Corporation that was operating the park would take the firewood and would sell it to people who were camping in the park so that they could use it in the park. Here, however, Mr. Hutton took the firewood home and burned it at his home, and all of that is undisputed in the record. How much wood did he take? I believe the record shows that he took a pickup truck full. These are logs that he cut and then split on site? Actually, I don't recall whether or not he cut some of them up. It was a large tree that was felled. It was down on the ground. I think it had been bucked up. I believe the record shows it had been bucked up to firewood length. I don't recall whether or not he cut it further in any way, but I do know that the... Someone says they saw him with his chainsaw. The on-site administrator for Greater Applegate saw it, and when Mr. Vile got a letter from Greater Applegate, he immediately called that person and said, did you see it?  I believe the record also shows that person even went then and talked to Mr. Hutton while he was loading his truck and said, what are you doing? And they had a conversation at that point, but that's it. Thank you. Ms. Anderson. Thank you. Just a couple of points I'd like to address. First of all, I would like to point out that Mr. Vile came on board with the county in March of 2008. March of 2008 is when he came on. He was the new manager, and he – I don't think there's any question but that the two gentlemen did not get along. My client was terminated in December of 2008, nine months after Mr. Vile came on board. With regard to the at-will policy, I would draw your attention to supplemental excerpts of record page 99. That is the written policy distributed by the county, and at the bottom, Mr. Hutton, there's typewritten text at the bottom. I disagree with signing this policy after 25 years of employment with Jackson County. My signature on this policy is a result of being forced to sign by Jackson County. He clearly did not agree that this at-will policy applied to him. He had a clear understanding. Counsel, what's your best argument about the firewood incident? Oh, the firewood. There is, in the summary judgment record below, there's a declaration that was put in with regard to the firewood. Historically, the firewood had been available for the public. You have to keep the park clean. You have to engage in fire suppression. Wait a minute. When you say the firewood was available to the public, there's one thing if you're selling it or making it available to people who are camping in the park, and another thing if you just say, here's free firewood, come and load your truck. Correct. And historically, it was just there for the taking. I think that the sale of the firewood to the folks who were visiting was a fairly recent development. And the park manager who resided on site used the firewood himself to heat his home on site. His own home in the park. Correct. That's a little different than taking it to your house. I don't, I'm not going to argue with you on that. I agree with you. The question is, is this, given the historical pattern of having the wood available free for the taking. Did Mr. Hutton testify that he had taken wood from before? Yeah, yeah. It had been going on for years. And there was no hiding. He wasn't hiding what he was doing. He absolutely admitted to it. He didn't believe that what he was doing was wrong. Put my nose in the record that shows your side of the story. That is to say that he didn't know that he was doing anything wrong. He'd done it before. The prior practice was that it was there for the taking. I mean, I think that's a summary of what you just said. Yes, Your Honor. Below there was a declaration put in, I apologize, I can't recall the fellow's name. It was a very brief declaration. With regard to the history of the firewood in the park. And I included it in my, it's the Dennis Nicholas statement. Okay. What page is that? It begins at page 88 of the excerpts of record. And Mr. Nicholas sets out the history of the use of firewood. But I really think that the ultimate question. Hang on a second, I want to read it. Sure. This is quite different, counsel. It was common for employees at the parks to use wood for their own purposes as they were living on the park premises. It was anticipated that campers at the various parks would make use of the wood. The use made by campers was not monitored. It was entirely possible and even likely that some of the wood would be taken away by campers for personal use. Mr. Hutton doesn't come within any of those categories. He's not living on the property and he's not a camper. I agree with you, but I think that these are questions for a jury to determine whether or not it's appropriate to terminate a fellow after 32 years for this sort of conduct. But wait a minute. You've argued, you've argued that historically firewood was available for the taking, and that's not entirely true. It might have been taken, he says, by campers who might have taken some away with them, sort of souvenir firewood. Mr. Hutton was not a souvenir taker. I agree. He was a county employee who came and took firewood and took it to his house. We don't have any evidence here that I can see that anyone had ever done that before. Beginning at page 52 of the excerpts of record, this is the deposition testimony. Excuse me. And this is where Mr. Hutton actually addresses page 53. He saw it laying on the ground. And he cut the he had his own chainsaw and he did that. And he talks on page 56 about the history. Common practice in county parks that when it comes to wood debris, we normally leave it on the ground for public use, or if necessary, we'll pick up the brush, whatever, and take it to the biomass. That's a recycling facility. I'm looking at the bottom of page 56. I don't see that he says there that anybody picked it to their house. Page 57. I felt that since the public had the same access and opportunities I did, I felt it would be okay if I took some of the wood. And it's a mutual benefit because he's helping the county park clean up the mess and he's going to take some firewood to help himself. Page 57 really is where he gets to the point on this, and I think that's for a jury to consider. I don't think summary judgment on that issue is appropriate. Okay. All right. Thank you. Thank you very much. Thank both sides for your argument. The case of Hutton v. Jackson County submitted for decision. Thank you.
judges: Fletcher, Fisher, Bybee